**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRYAN D. REBER,** | : | |
| | : | Case No. 2:14-CV-2694 |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge King** |
| **LABORATORY CORPORATION OF** | : | |
| **AMERICA; LABORATORY** | : | |
| **CORPORATION OF AMERICA** | : | |
| **HOLDINGS; and JESSICA QUEEN,** | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter is before the Court on several matters: (1) Defendants Laboratory Corporation of America and Laboratory Corporation of America Holdings' (collectively, "LabCorp" or "Defendants") Motion to Exclude Plaintiff's Experts (Doc. 61); (2) Defendants' Motion to Strike Portions of Plaintiff's Recent Filings ("Motion to Strike") (Doc. 78); (3) Plaintiff's Motion for Leave to File Surreply in Opposition to Defendants' Motion to Strike ("Motion for Surreply") (Doc. 89); (4) Defendants' Motion for Summary Judgment (Doc. 62); and (5) Plaintiff's Motion for Partial Summary Judgment as to Defendants' Comparative Fault/Third Party Liability Affirmative Defenses ("Motion for Partial Summary Judgment") (Doc. 73).

For the reasons that follow, the Court: (1) **GRANTS in part** and **DENIES in part** Defendants' Motion to Exclude Plaintiff's Experts (Doc. 61); (2) **GRANTS in part** and **DENIES in part** Defendants' Motion to Strike (Doc. 78); (3) **GRANTS** Plaintiff's Motion for Surreply (Doc. 89); (4) **GRANTS in part** and **DENIES in part** Defendants' Motion for

Summary Judgment (Doc. 62); and (5) **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. 73).

## I.  BACKGROUND

### A.  Factual Background

Plaintiff Bryan D. Reber commenced this personal injury, medical negligence, and wrongful death action against Defendant LabCorp and one of LabCorp's cytotechnologists, Jessica Queen, after the death of his wife, Lisa Kay Reber.  On April 11, 2011, Mrs. Reber's gynecologist, Dr. Shelley Thompson, performed a Pap smear on her in Fairfield County, Ohio and sent the specimen on a slide to Defendant LabCorp for testing and interpretation.  Defendant Queen tested the Pap smear slide at LabCorp's Charleston, West Virginia facility and signed the Pap Smear Report, indicating that it tested "negative for intraepithelial lesion and malignancy," which indicates a normal result.  No physician reviewed the slide.  In fact, the April 2011 slide revealed abnormalities.  Defendant LabCorp sent the results to Dr. Thompson, who instructed her to return for a follow-up visit and Pap test in April 2012.

Mrs. Reber got her next Pap test on December 10, 2012.  Two days later, she was diagnosed with an aggressive form of cervical cancer.  Over the next several months, Mrs. Reber underwent a radical hysterectomy and received chemotherapy and radiation.  She and her sister discussed hiring a lawyer in July 2013.  She died on December 25, 2013.

### B.  Procedural Background

Plaintiff, Mrs. Reber's husband, brought this lawsuit against LabCorp on December 20, 2014, alleging alternative claims for negligence (Count I) and medical negligence (Count II) for misinterpreting and reporting the results of the April 2011 slide, which caused the delay in diagnosing and treating Mrs. Reber's cervical cancer.  He also brought a wrongful death claim (Count III) from the "significant delay in diagnosing her cervical cancer."  (Doc. 1 at ¶¶ 22-37.)

Plaintiff further alleges, in paragraphs 37 to 48 of the complaint in a section titled "Claims for Relief of Plaintiff Against LabCorp," that he is entitled to punitive damages because LabCorp's failure to exercise reasonable care in interpreting Mrs. Reber's Pap smear slide was "a product of LabCorp's systemic and intentional business practice that places LabCorp's interest before the welfare of the patients." (*Id.* ¶ 39.) Plaintiff alleges that LabCorp fails to provide sufficient educational instruction to its cytotechnologists and to make downward adjustments in the number of slides each cytotechnologist is required to screen even when the cytotechnologists' error rates are high. (*Id.* ¶¶ 41-43.) The Court granted LabCorp's Motion to Dismiss Plaintiff's allusion to a fraud claim in paragraph 46, but otherwise denied LabCorp's Motion to Dismiss Plaintiff's punitive damages claim. (Doc. 31 at 9-12.)

This Opinion & Order addresses the following motions, which are ripe for review: (1) Defendants' Motion to Exclude Plaintiff's Experts (Doc. 61); (2) Defendants' Motion to Strike (Doc. 78); (3) Plaintiff's Motion for Leave to File Surreply (Doc. 89); (4) Defendants' Motion for Summary Judgment (Doc. 62); and (5) Plaintiff's Motion for Partial Summary Judgment (Doc. 73). Before the Court addresses those issues, however, the Court must resolve whether the Plaintiff's claim is a "medical claim" under Ohio law.

## II.  ANALYSIS

### A.  Plaintiff's Claim for Negligence Is Not a "medical claim" under Ohio Statute

A threshold matter to both Defendants' Motion to Exclude Plaintiff's Experts and Defendants' Motion for Summary Judgment is whether Plaintiff's claims for negligence in Count I and medical negligence in Count II are "medical claims" under Ohio Revised Code § 2305.113(E)(3).

Under Ohio Revised Code § 2305.113(E)(3), a "medical claim" is

any claim that is asserted in any civil action against a physician, podiatrist, hospital, home, or residential facility, against any employee or agent of a physician, podiatrist, hospital, home, or residential facility, or against a licensed practical nurse, registered nurse, advanced practice registered nurse, physical therapist, physician assistant, emergency medical technician-basic, emergency medical technician-intermediate, or emergency medical technician-paramedic, and that arises out of the medical diagnosis, care, or treatment of any person[.]

Ohio Rev. Code § 2305.113(E)(3). The Ohio Supreme Court has held that this statute is "plain and unambiguous" in requiring the claim to be "asserted against one or more of the specifically enumerated medical providers" listed in § 2305.113(E)(3), as well as requiring the claim to "arise[] out of medical diagnosis, care, or treatment." *Estate of Stevic v. Bio-Medical Application of Ohio, Inc.*, 121 Ohio St. 3d 488, 491 (Ohio 2009). Because the "medical claim" definition is "plain and unambiguous," the Court "must give full meaning to all of the express statutory language." *Id.* And the statute "specifically lists and defines the types of claims included within its ambit." *Id.* at 490.

Plaintiff points out that cytotechnologists are not specifically enumerated in the statute; on this basis, he argues that his lawsuit is not a "medical claim." (Doc. 70 at 9.) In addition to *Stevic*, Reber cites two Ohio trial court cases finding that § 2305.113(E)(3) excludes pharmacists because they are not specifically enumerated in the statute. *Moore v. Covenant Care Ohio, Inc.*, No. CI 201202706, 2013 Ohio Misc. LEXIS 159, at *6 (Ohio Ct. Com. Pl. Oct. 29, 2013) ("However, the Court does not find that pharmacists are expressly included in the statute's definition of medical professionals. Accordingly, the application of R.C. 2305.113 to the present claims would, improperly expand the legislature's, [sic] intent and constitute an unsupported interpretation of the same."); *Yerkey v. Spectrum Orthopaeducs, Inc.*, Ohio Ct. Pleas No. 2016-cv-00794, Doc. 70 at 22 ("The Court finds that the General Assembly went to great lengths in

specifically listing the medical providers to whom the term 'medical claim' applied, and had the General Assembly intended to include claims against a pharmacist it would have done so.").

Reber also cites a series of cases interpreting Ohio Revised Code § 2305.11(A), which sets a one-year statute of limitations for "malpractice other than an action upon a medical, dental, optometric, or chiropractic claim[.]" Ohio Rev. Code § 2305.11(A). These cases show that the Ohio Supreme Court, and other Ohio courts, refuse to interpret § 2305.11(A) to include related but non-enumerated disciplines to the list "malpractice . . . , medical, dental, optometric, or chiropractic claim." *Thompson v. Cmty Mental Health Ctrs. of Warren Cty., Inc*., 642 N.E.2d 1102, 1104 (Ohio 1994) ("Having expressly included some disciplines heretofore excluded, it is not logical to assume that other disciplines are to be joined by silent implication. We conclude that a cause of action arising from the claimed negligence of a licensed independent social worker, a licensed psychologist or a licensed mental health care facility is not a claim for malpractice and is therefore not governed by R.C. 2305.11."); *Whitt v. Columbus Co-op. Enters*, 415 N.E.2d 985, 987 (Ohio 1980) ("If the General Assembly had wished to protect groups which are not traditionally associated with malpractice, such as optometrists and dentists, it would have listed them under R.C. 2305.11(A), as it did by amendment for podiatrists and hospitals, or included them in an expanded definition of 'physician' under R.C. 2305.11(D). . . . Accordingly, we find that negligence by an optometrist is not within the meaning of malpractice under R.C. 2305.11(A)."); *Hocking Conservancy Dist. v. Dodson-Lindblom Assocs, Inc*., 404 N.E.2d 164, 166-67 (Ohio 1980) (holding that 2305.11(A) includes "malpractice," which is limited to the acts of physicians or lawyers, plus the specifically statutorily-enumerated categories, but not engineers); *Richardson v. Doe*, 199 N.E.2d 878, 880 (Ohio 1964) (negligence of a nurse falls outside 2305.11(A)); *Campbell v. Beliscus*, No. C-880605, 1989 Ohio App.

LEXIS 3706, at *5-6 (Ct. App. 1st Dist. Sep. 27, 1989) "Whether the appellee . . . was a jeweler, a laboratory technician, a pseudo-dentist, an immigrant or a gypsy, it is clear from the record that her occupation was not one enumerated by [2305.11(A)] or falling within the common-law definition of malpractice so as to be given the special protection of a one-year statute of limitations."); *Reese v. K-Mart Corp.*, 443 N.E.2d 1391, 1392 (Ohio Ct. App. 10th Dist. 1981) (same for pharmacists).

Defendants attempt to distinguish the cases interpreting Ohio Revised Code § 2305.11(A) on the grounds that "medical malpractice" is different from a "medical claim." (Doc. 81 at 9.) While the Court agrees that the concepts are not the same, the Ohio Supreme Court's interpretation of a similar list of specifically-enumerated providers has some persuasive value regarding how the Ohio Supreme Court would interpret Ohio Revised Code § 2305.113. Defendants also argue: (1) Ohio courts have found claims outside the enumerated medical providers to be "medical claims;" (2) Plaintiff's "pharmacist" cases are unpersuasive; and (3) the facts of this case militate in favor of considering Plaintiff's claim to be a "medical claim." (Doc. 81 at 4-8.)

Defendants are mistaken in arguing that Ohio courts have gone outside the enumerated categories of Ohio Revised Code § 2305.113(E)(3). For this position, Defendants cite *Schumacher v. Corrections Corporation of America*, No. 4:15-CV-01919, 2016 WL 3629015, at *3 (N.D. Ohio July 7, 2016), *St. John v. Bosley, Inc.*, 481 F. App'x 988, 990 (6th Cir. 2012), *Bartley v. Hearth & Care of Greenfield, L.L.C.*, 2013-Ohio-279, ¶ 8 (Ohio App. 4 Dist. 2013), *Tisdale v. Toledo Hosp.*, 967 N.E.2d 280, 291 (Ohio App. 6 Dist. 2012), and *York v. Hutchins*, 2014-Ohio-988, ¶¶ 12-14 (Ohio Ct. App. 12th Dist. 2014). Each of these cases, however, lead back to the enumerated categories. Defendants cite *Schumacher* for the proposition that "the

requirements of Civ. R. 10(D)(2) and R.C. 2305.113 apply in prison inmate medical claims." *Schumacher*, 2016 WL 3629015, at *3. Tracing *Schumacher* back, however, leads right back to the enumerated category "hospital." *Schumacher* relies on *Foster v. Department of Rehabilitation & Correction*, 2013-Ohio-912, ¶ 33 (Ohio App. 10 Dist. 2013), which in turn relies on *Franks v. Department of Rehabilitation & Correction*, 958 N.E.2d 1253, 1256–57 (Ohio App. 10 Dist. 2011). *Franks*, citing another Ohio Appellate court, found the Ohio Department of Rehabilitation and Correction to be a "*hospital* under the statutory definition." *Franks*, 958 N.E.2d 1253, 1256–57 (Ohio App. 10 Dist. 2011) (emphasis added). *St. John*, too, finds defendants to be in an "expressly covered" category—doctors. 481 F. App'x at 990. And *Bartley* cites *Tisdale*, which holds that "medical *employees,* such as nurses, technicians or other assistants . . . are amenable to '*medical* claims.'" *Bartley*, 2013-Ohio-279, ¶ 8 (emphasis in original). The statute expressly covers an "employee or agent of a physician, podiatrist, hospital, home, or residential facility," and Defendants do not argue that the cytotechnologist is such an employee.[1] Rather, they argue that courts go outside the statutory categories. As the cases Defendants cite make clear, courts do not. Finally, *York* deals with a claim against doctors involved in performing unnecessary surgery on her—again, a specifically-enumerated category. 2014-Ohio-988 at ¶ 4.

These cases do not convince the Court to deviate from the list of medical providers specifically enumerated in the statute. The Ohio legislature chose to include a specific list of medical providers in the definition of "medical claim," including three distinct types of emergency medical technician. While drafting the statute, the legislature undoubtedly was aware of the existence of cytotechnologists (especially given their role, as related by defense counsel at

---

[1] Defense counsel suggests during oral argument that Ms. Queen may be an "agent" of a hospital, but she does not point the Court to any cases so holding.

oral argument, in Pap tests, the most effective means of reducing cancer risks), just as it was aware of the existence of pharmacists. Expressio unis est exclusio alterius, the mention of one excludes the other. Had the legislature intended to include cytotechnologists or non-hospital-affiliated laboratories in the definition of "medical claim," it would have. Because a cytotechnologist does not fall within the statutorily-enumerated categories, a claim of negligence against the cytotechnologist in this case is not a "medical claim" under Ohio statutory law.[2]

## B. Defendants' Motion to Exclude Plaintiff's Experts

LabCorp argues that two of Plaintiff's experts, Dr. Rosenthal and Ms. Tan, must be excluded because: (a) a nine-page portion of their opinions (which LabCorp terms the "Lab Deficiency Opinions") was ghostwritten by Plaintiff's counsel; (b) the experts are not qualified to issue their opinions; and (c) the opinions are devoid of any reliable methodology.

### 1. Standard of Review

Federal Rule of Evidence 702 governs the testimony of expert witnesses as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

This rule reflects the Supreme Court's decisions in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008).

Together, Rule 702, *Daubert*, and *Kumho Tire* establish that district courts may admit expert testimony if it satisfies three requirements. *Id.* at 528-29 (describing the district courts' responsibility "of acting as gatekeepers to exclude unreliable expert testimony"). First, "the

---

[2] Because courts read the enumerated categories narrowly, and because cytotechnologists do not fall within the categories, Defendants' arguments analogizing the categories are moot.

witness must be qualified by 'knowledge, skill, experience, training, or education.'" *Id.* at 529

(quoting Fed. R. Evid. 702). Second, the testimony "must be relevant, meaning that it will assist

the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quotation

omitted). Third, "the testimony must be reliable." *Id.* To be relevant, expert testimony must

"fit" with the issues to be resolved at trial. *Greenwell v. Boatwright*, 184 F.3d 492, 496

(6th Cir. 1999). The reliability requirement, in turn, focuses on the methodology and principles

underlying the testimony. *Id.* at 496-97. The proponent of the testimony—in this case,

Plaintiff—must establish admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas

Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

### 2. Ghostwriting

Defendants argue that the reports of Dr. Rosenthal and Ms. Tan must be stricken for

failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B), which requires an expert

report to be "prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). The 1993

Advisory Notes to Rule 26(a)(2)(B) provide that the rule "does not preclude counsel from

providing assistance to experts in preparing the reports. . . . Nevertheless, the report, which is

intended to set forth the substance of the direct examination, should be written in a manner that

reflects the testimony to be given by the witness and it must be signed by the witness." Fed. R.

Civ. P. 26(a)(2)(B).

Because Plaintiff's counsel "ghostwrote" the Lab Deficiency Opinions, which comprise

nine pages of the reports, Defendants claim that the reports were not "prepared" by the

witnesses. Defendants argue that the Lab Deficiency Opinions were "ghostwritten" by

Plaintiff's counsel because: (a) the nine pages in each report are identical, even though they

purportedly come from separate experts; (b) the reports are "stuffed" with legal rhetoric; (c)

Plaintiff's counsel withdrew parts of Ms. Tan's report without consulting her; and (d) Plaintiff's experts could not explain parts of their Lab Deficiency Opinions during their depositions.

This violation of Rule 26(a)(2)(B), Defendants argue, requires exclusion under Rule 37(c)(1), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ P. 37(c)(1). Further, Defendants maintain that this failure irretrievably taints the experts' credibility such that the Court should strike their entire reports.

Plaintiff responds by withdrawing one of the three opinions contained in the Lab Deficiency Opinions,[3] and by arguing that the remaining opinions conformed with the federal rules even if counsel was involved in their creation. He argues that the remaining opinions "were developed through independent analysis," though tellingly he does not attribute this analysis to the experts. (Doc. 69 at 10-12.) Instead, he uses the term "we" while describing the calculations. (*Id.*)[4] Plaintiff also argues that the "fundamental opinions," the opinions regarding Ms. Queen's negligence, should not be excluded even if the Court excludes the Lab Deficiency Opinions. (Doc. 60 at 2-10.)

---

[3] The Lab Deficiency Opinions contain three conclusions:

(1) a conclusion regarding corrective actions and discrepancy rates, which Dr. Rosenthal could not explain and disagreed with during her deposition, and which Plaintiff now withdraws;

(2) a conclusion that LabCorp's cytotechnologists review too many slides per day; and

(3) a conclusion that Jessica Queen did not have enough minutes in the day on April 12, 2011 to have actually completed the number of slides she claims to have read

[4] The Court notes that he does partially attribute the calculations to the experts at the end of the argument by saying "these simple calculations *by Plaintiff's experts*[.]" (*id.* at 12) (emphasis added).

Defendants argue that Plaintiff's counsel's wholesale crafting and drafting the Lab Deficiency Opinions precludes their use at trial. Indeed, the question of "[w]hether an expert report was prepared in a manner consistent with the mandates of Rule 26, usually turns on whether counsel's participation so exceeds the bounds of legitimate assistance as to negate the possibility that the expert actually prepared his own report[.]" *Bekaert Corp. v. City of Dyersburg*, 256 F.R.D. 573, 578 (W.D. Tenn. 2009) (excluding declaration that was initially prepared by counsel, and of which expert could not identify any portion that "could be said to have been his testimony."). In other words, "the expert must substantially participate in the preparation of his report." *Id.* And "substantial participation" means that an attorney may help fine-tune a report, but may not "prepar[e] the expert's opinion from whole cloth and then ask[] the expert to sign it if he or she wishes to adopt it[.]" *Id. See also James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Management, LLC*, 2014 WL 1744848, at *6 (E.D. Ky. 2014) (excluding under Rule 37(c)(1) expert report that was 90% prepared by defense counsel, because "'preparation' means involvement in the creation rather than 'perusing a report drafted by someone else and signing one's name at the bottom to signify agreement.'"); *In re Jackson Nat. Life Ins. Co. Premium Litigation*, No. 96–MD–1122, 2000 WL 33654070, at *2 (W.D. Mich. Feb. 8, 2000) (affirming magistrate judge decision excluding under Rule 37(c) expert whose entire report was written by Plaintiff's counsel, and who testified untruthfully during his deposition regarding this authorship).

Plaintiff cites *United States v. Kalymon*, 541 F.3d 624 (6th Cir. 2008) to argue that his counsel's involvement in the Lab Deficiency Opinions comported with the federal rules. In *Kalymon*, the experts "told government counsel their substantive opinions, and then counsel reduced those opinions to writing for the experts' review and signature." *Id.* at 637. According

to the Sixth Circuit, "there is nothing inherently nefarious in this . . . . A party's attorney can reduce an expert's oral opinion to writing so long as the report reflects the actual views of the expert." *Id.* at 638. *See also Tindall v. H & S Homes, LLC*, No. 5:10–CV–044, 2012 WL 3241885, at *1 (M.D. Ga. Aug. 7, 2012) ("The Court is not convinced, however, that counsel's assistance and involvement in drafting the report is completely prohibited—even if the assistance involves preparing the entire first draft—so long as there is 'prior, substantive input' [(here, multiple, lengthy telephone conversations and evidence that the expert modified the draft)] from the expert witness.); *Manning v. Crockett*, No. 95 C 3117, 1999 WL 342715, at *2 (N.D. Ill. May 18, 1999) (denying without prejudice the plaintiffs' motion to exclude expert report that is substantially similar to the complaint for lack of evidence supporting the conclusion that the expert "lacked significant personal involvement in the preparation of his report."); *Keystone Mfg. Co., Inc. v. Jaccard Corp.*, 394 F.Supp.2d 543, 568 (W.D.N.Y. 2005) (declining to disqualify expert who swore that he "was substantially involved in the preparation of his expert report and the opinions contained therein are his").

In Reber's case, however, there is no evidence that Plaintiff's counsel simply took down the experts' oral opinions or that the experts had substantial involvement in the preparation of the Lab Deficiency Opinions. On the contrary, the following evidence supports the idea that Plaintiff's counsel "prepar[ed] the expert[s'] opinion[s] from whole cloth and then ask[ed] the expert[s] to sign it if [they] wishe[d] to adopt it," *Bekaert*, 256 F.R.D. at 578:

(a) Dr. Rosenthal's and Ms. Tan's Lab Deficiency opinions are word-for-word identical;

(b) Dr. Rosenthal stated in her deposition that she would not have calculated error rates in the way that her Lab Deficiency Opinion appears to have calculated them (Rosenthal Dep., Doc. 61-12, at 420:22-421:14);

(c) Dr. Rosenthal stated in her deposition that, looking at a wider breadth of data, the Lab Deficiency Opinion on discrepancy rates does not necessarily hold (*id.* at 446:8-14);

(d) Ms. Tan testified in her deposition that she did not write or edit any draft of her report; rather, she went over the report after Plaintiff's counsel drafted it, and that she "verified all the calculations and understood the bases for all of the opinions" (Tan Dep., Doc. 62-9, at 312:13-21, 316:5-317:15.);

(e) Ms. Tan was "blindly told" by Plaintiff's counsel that Plaintiff was withdrawing some of her opinions (*id.* at 319:21-24); and

(f) Ms. Tan did not ask why Plaintiff's counsel decided to withdraw some of her opinions (*id.* at 320:1-2).

Based on the foregoing, the Court cannot find that Dr. Rosenthal or Ms. Tan had "involvement in the creation rather than 'perusing a report drafted by someone else and signing one's name at the bottom to signify agreement.'" *Scatuorchio*, 2014 WL 1744848, at *6. As such, the Lab Deficiency Opinions violate Rule 26, and must be excluded under Rule 37 unless the failure is substantially justified or harmless. Fed. R. Civ P. 37(c)(1).

Though Plaintiff fails to argue either prong, the Court does not see a way in which the Rule 26 violation—the experts' non-participation in the creation of Lab Deficiency Opinions that they did not fully vet or agree with—is substantially justified or harmless. As the 1993 Advisory Committee Notes to Rule 37(c) explain:

> Limiting the automatic sanction to violations "without substantial justification," coupled with the exception for violations that are "harmless," is needed to avoid unduly harsh penalties in a variety of situations: *e.g.,* the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures.

Fed. R. Civ. P. 37(c)(1). *See also Vaughn v. City of Lebanon*, 18 F. App'x 252, 264 (6th Cir. 2001). The situation here is of a different caliber. Therefore, and for all of the reasons stated above, the Court must exclude the Lab Deficiency Opinions under Rule 37(c)(1).

This conclusion, however, does not extend to the remainder of the experts' opinions. Defendants do not argue that Dr. Rosenthal and Ms. Tan did not prepare the remainder of their reports. Instead, they suggest that the experts' credibility is so marred by their passive participation in the Lab Deficiency opinions that all of their testimony, including their opinions about the slide that Ms. Queen misread, should be excluded. (Doc. 80 at 4-6.) But they fail to identify a case where a Court excludes expert testimony that does *not* violate Rule 26 on the grounds that other testimony *does* violate Rule 26. The Court declines to impose such a sanction.

Because the Court excludes the Lab Deficiency Opinions based on a violation of Rule 26, the Court need not reach Defendants' arguments as to the experts' underlying qualifications and methodology in making these opinions. The Court will address, however, Defendants' arguments regarding Dr. Rosenthal's qualifications to opine on the standard of care in this case.

### 3. Dr. Rosenthal's Qualification to Opine on the Standard of Care in this Case

Defendants argue that Dr. Rosenthal is not qualified to opine on the standard of care in this case, because: (a) she is barred by Ohio Rule of Evidence 601(D); and (b) she suggests in her deposition that cytopathologists who do not practice regularly may not be qualified to render diagnoses on slides. (Doc. 61-1 at 26-30.)

Defendants entangle two concepts that the Sixth Circuit has found to be "intimately intertwined," yet distinct: competency to be a witness, and qualification to opine as an expert witness. *Bock v. Univ. of Tenn. Med. Group, Inc.*, 471 F. App'x 459, 461-62 (6th Cir. 2012), quoting *Legg v. Chopra*, 286 F.3d 286, 290 (6th Cir. 2002) (discussing Tennessee's witness

competency rule). Witness competency is governed by state law, whereas expert qualification is governed by Federal Rule of Evidence 702 and *Daubert*. *Id.*

Although Defendants argue that Dr. Rosenthal is not "qualified" based on Ohio Rule of Evidence 601(D), the Court will construe this argument as one that Dr. Rosenthal is not "competent." Regardless of semantics, Rule 601(D) applies only to "medical claims" under Ohio Revised Code § 2305.113. Therefore, Defendants' 601(D) argument is predicated on the Court finding Plaintiff's claim to be a "medical claim" under Ohio Revised Code § 2305.113. (Doc. 61-1 at 26-27.) Ohio Evid. R. 601(D) (disqualifying as incompetent a witness who is "[a] person giving expert testimony on the issue of liability in any medical claim, as defined in R.C. 2305.113," unless certain preconditions are met). Because the Court finds that Plaintiff's claim is *not* a "medical claim" as defined in Section 2305.113, Ohio Rule of Evidence 601(D) is not a basis to render finding Dr. Rosenthal incompetent as a witness.

As for whether Dr. Rosenthal is qualified to be an expert witness, Federal Rule of Evidence 702 provides that "the witness must be qualified by 'knowledge, skill, experience, training, or education.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). Defendants do not argue that Dr. Rosenthal lacks the "knowledge, skill, experience, training, or education" to opine on the standard of care for a cytotechnologist.

Instead, they argue that a standard created by Dr. Rosenthal's testimony in other cases renders her unqualified to opine on the standard of care in this case. The thrust of her testimony in these cases is that a pathologist who "only occasionally reviews slides . . . is not qualified to interpret a slide in litigation" because "[a]ny anatomic microscopic pathology is [a qualitative, subjective skill], and you need to have your skills fine-tuned almost on a daily basis. We even find that if we go off for a few weeks, it takes a few days for us, as we call it, to get our eye

back." (Doc. 61-1 at 33-34.) Because Dr. Rosenthal is now retired from regularly reviewing slides, Defendants argue that, by her own metric, she is not qualified to render an opinion on the standard of care in this case.[5] Plaintiff responds that the standard Defendants espouse is "artificial," presumably because it is a different qualification standard from that enunciated in *Daubert* and Rule 702. (Doc. 69 at 2-6.)

While Rule 702 states that "the witness must be qualified by 'knowledge, skill, experience, training, or education,'" it does *not* say that the witness must be qualified with daily practice. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). Dr. Rosenthal's comments may be an excellent source of cross-examination for defense counsel; they do not, however, change the qualification standards of Federal Rule of Evidence 702. Moreover, as a factual matter, the record is not clear that Dr. Rosenthal did not meet her own standard by spending a few days "getting her eyes back" before reviewing Mrs. Reber's slides. In sum, the Court declines to disqualify Dr. Rosenthal for the sole reason that she retired from regular review of slides.

### C. Defendants' Motion to Strike and Plaintiff's Motion for Surreply

Defendants seek to strike portions of Plaintiff's Opposition to Defendants' Motion to Exclude his Experts, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Plaintiff's Statement of Facts, and Plaintiff's Motion for Partial Summary Judgment, (Docs. 69-73), on the grounds that certain sections: (1) have no record citations; (2) are unsupported by the alleged record citation; or (3) are impermissible hearsay. (Doc. 78 at 1.) Defendants also seek to prevent the Court's review of various documents that Plaintiff filed one day late. (Doc. 88 at 1-

---

[5] The parties argue over the import of *Adams v. Laboratory Corporation of America*, a case in which the Eleventh Circuit allowed Dr. Rosenthal to serve as a standard of care expert in a case against LabCorp cytotechnologists who failed to identify abnormalities in Pap smears. 760 F.3d 1322, 1325-27 (11th Cir. 2014). This opinion concerned a slide that Dr. Rosenthal reviewed before she was retired, however, and therefore does not address the issues raised by Defendants' argument.

2.) It is this timeliness argument that Plaintiff seeks to rebut in its requested surreply. (Doc. 89.) The Court will address the timeliness arguments first.

Defendants seek to preclude the Court's review of several of Plaintiff's filings because Plaintiff filed them one day late. Defendants first raised this issue in their reply in support of their Motion to Strike. Plaintiff seeks the Court's leave to file a surreply to explain the situation, which involved Plaintiff's counsel's inadvertent entry into its system of day-off due dates. Because Plaintiff did not have a chance to respond to Defendants' timeliness argument, the Court **GRANTS** his request for leave to file a surreply. *See Koch v. Cnty of Franklin, Ohio*, No. 2:08–cv–1127, 2010 WL 2386352, at *4 (S.D. Ohio June 10, 2010) ("a district court responding to a request for leave to file a sur-reply 'routinely grants such motions when a party is unable to contest matters presented to the court for the first time in the last scheduled pleading.'").

As to the timeliness issue itself, "when an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). To analyze excusable neglect, the Court weighs five factors: "(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith." *Nafziger v. McDermott Intern., Inc.*, 467 F.3d 514, 522 (6th Cir. 2006). Because Plaintiff made its filings only one day late, the Court finds that Defendants were not prejudiced by the delay. Moreover, the one-day delay did not affect the judicial proceedings. The Court also considers that the delay was due to a clerical error, and appears to have been made in good faith. Because four of five factors weigh in favor

of Plaintiff, the Court finds that Plaintiff made its one-day late filings due to excusable neglect, and the Court declines to strike Plaintiff's filings for being untimely.

As to the substance of Defendants' Motion to Strike, certain passages that Defendants seek to strike play no role in the Court's analysis on summary judgment. As such, the Court need not address: (a) the statements in Plaintiff's Opposition to Defendants' Motion to Exclude Plaintiff's Experts; (b) Plaintiff's statements in his Opposition to Defendants' Motion for Summary Judgment that Reber's family discovered the slide misread in October 2014; and (c) paragraphs 18 and 23-25 of Plaintiff's Statement of Facts. Moreover, Plaintiff conceded that paragraphs 36 and 37 of his Statement of Facts, and related references in pages 18-19 of Plaintiff's Motion for Partial Summary Judgment, relied on withdrawn opinions from Dr. Irvin's report. Therefore, the Court will disregard paragraphs 36 and 37 and these related references in Plaintiff's Motion for Partial Summary Judgment.

The Court need address one item, however. Defendants seek to strike the following passage contained in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, on hearsay grounds and because it contains no record citations:

> Plaintiff's claims for punitive damages are further supported by LabCorp's insistence that its cytotechnologists read more than 100 slides a day. LabCorp has done no studies of its own with regard to the number of slides that it is safe for cytotechnologists to review. This despite being one of the largest, if not the largest, lab [sic] in the country. While LabCorp has done nothing to evaluate this very important issue, others have. In February 2010, a full year before the misread in our case, the article "Increasing cytotechnologists workload above 100 slides per day using the ThinPrep imaging system leads to significant reductions in screening accuracy" was published in the American Cancer Society's Journal "Cancer Cytopathology." LabCorp did nothing in response to this seminal Publication: no internal studies, no discussions about the workload for its cytotechnologists.

(Doc. 78 at 4, citing Doc. 70 at 14-15.) Plaintiff responds that the deposition testimony of Carla Helton, LabCorp cytology supervisor for the Charleston, West Virginia LabCorp facility,

supports these statements. Plaintiff does not explain, however, how a lab supervisor at one facility of many (given LabCorp's position as "one of the largest, if not the largest, lab in the country") would have personal knowledge of LabCorp's responses, or studies, on its own or in relation to the cited article. As Defendants point out, Carla Helton was not a Rule 30(b)(6) witness. Because Carla Helton's testimony does not support these statements, Court will disregard them. *See Baba-Singhri v. Central State Univ.*, No. 3:03-cv-429, 2008 WL 656497, at *11 n.13 (S.D. Ohio Mar. 10, 2008).

In sum, the Court will disregard paragraphs 36 and 37 of the Plaintiff's Statement of Facts, and the related references in Plaintiff's Motion for Partial Summary Judgment, and the above excerpt contained on pages 14-15 of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

### D. The Parties' Motions for Summary Judgment

Defendants moved for summary judgment on the basis of: (a) Defendants' Motion to Exclude Plaintiff's experts; (b) the statute of limitations for medical claims; and (c) a lack of evidence to support punitive damages. Plaintiff moved for summary judgment on Defendants' contributory negligence affirmative defense. The Court will address each in turn.

#### 1. Standard of Review

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The movant may also meet this burden by pointing to the absence of

evidence supporting one or more essential elements of the non-movant's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party who has the burden of proof at trial must "make a showing sufficient to establish the existence of [each] element that is essential to that party's case." *Muncie Power Products, Inc. v. United Technologies Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). In evaluating such a motion, the Court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

Because diversity jurisdiction provides the basis for this Court's jurisdiction, and because Plaintiff brings Ohio state-law claims, the Court assesses Plaintiff's substantive claims based on Ohio substantive law. *Coffey v. Foamex L.P.*, 2 F.3d 157, 160 (6th Cir. 1993).

**2. Because the Court Did Not Exclude Plaintiff's Experts' Standard of Care Opinions, Plaintiff Has Sufficient Evidence of Breach of Duty and Causation to Survive Summary Judgment**

The Court's ruling on Defendants' Motion to Exclude Plaintiff's Experts invariably affects the evidence Plaintiff may use to support his claims. Defendants argue that, should the Court exclude Plaintiff's experts in their entirety, Plaintiff's claims fail because he would lack the expert testimony required to show breach of duty and causation. As explained in section II(B), *supra*, the Court grants Defendants' Motion to Exclude Plaintiff's Experts' Lab Deficiency Opinions but denies the motion regarding their Standard of Care Opinions. Therefore, because the Court did not exclude the Standard of Care Opinions—including opinions on breach and causation—Defendants' motion for summary judgment on the grounds that Plaintiff lacks the expert evidence necessary to show breach and causation is **DENIED**.

**3. The Statute of Limitations Does Not Bar Plaintiff's Claims in Counts I and II**

Defendants seek summary judgment on Counts I and II of Plaintiff's Complaint based on the statute of limitations. Defendants argue that Plaintiff's claims for negligence accrued: (a) when she was diagnosed with cancer in December 2012 (Doc. 62-1 at 10); or (b) when Mrs. Reber began looking for a lawyer in July 2013. (*Id.* at 10-11.) Because her estate filed a lawsuit in December 2014, Defendants argue that she failed to sue within the one-year statute of limitations for "such medical claims" under Ohio law. (*Id.* at 10 (citing Ohio Rev. Code § 2305.113(A)).)

Ohio has a two-year statute of limitations for actions for bodily injury, Ohio Rev. Code § 2305.10(A), a one-year statute of limitations for "medical claims" as defined by Ohio Revised

Code § 2305.113(E)(3), and a one-year statute of limitations for "malpractice other than an action upon a medical, dental, optometric, or chiropractic claim[.]" Ohio Rev. Code § 2305.11(A). As explained by the Ohio Supreme Court, "[t]he statute of limitations contained in R.C. 2305.11(A) is limited to the areas specifically enumerated therein and to the common-law definition of 'malpractice.'" *Hocking Conservancy Dist. v. Dodson-Lindblom Assocs., Inc.*, 404 N.E.2d 164, 165 (Ohio 1980). The common-law definition of "malpractice" means the "intentional or negligent acts by physicians and lawyers." *Whitt v. Columbus Co-op. Enters.*, 415 N.E.2d 985, 987 (Ohio 1980). A cytotechnologist does not fall within Ohio Revised Code § 2305.11(A). The Court has also determined that Reber's claim is not a "medical claim" under Ohio Revised Code § 2305.113(E)(3). *Supra*, section II(A). In other words, the Ohio legislature did not choose specially to protect the cytotechnologist in this case with a one-year statute of limitations. Instead, Reber's claim falls under the general category of "actions for bodily injury," which carries a two-year statute of limitations from the date the cause of action accrued. Ohio Rev. Code § 2305.10(A).

Next, to determine whether the statute of limitations bars Reber's claims, the Court must determine when, factually, the claims accrued. Defendants argue that the claim accrued when Mrs. Reber was diagnosed with invasive cancer on December 12, 2012. (Doc. 81 at 8.) At the latest, they argue, her claim accrued "when Mrs. Reber and her sister actively sought an attorney to review her case in July 2013." (*Id.* at 9.) Plaintiff argues that his claim accrued in October 2014, after Plaintiff's expert determined that the slide was misread. (Doc. 70 at 5.)

Although both parties argue that Reber's claims are not "medical malpractice" claims, they both cite medical malpractice cases for the claims' accrual date. Regardless of the label ("medical malpractice," "medical claim," "claim for bodily injury"), however, for cases like

Reber's, Ohio courts have applied a discovery rule. *See, e.g.*, *Flagstar Bank, F.S.B. v. Airline Union's Mortg. Co*., 947 N.E.2d 672, 676 (Ohio 2011) (declining to extend discovery rule to negligent acts committed by a property appraiser, but citing with approval medical-negligence-related cases in which the Supreme Court applied the discovery rule); *Browning v. Burt*, 613 N.E.2d 993, 1005 (Ohio 1993) (citing with approval case in which the Supreme Court applied the discovery rule "to the R.C. 2305.10 general statute of limitations for bodily injury actions"); *Oliver v. Kaiser Community Health Foundation*, 449 N.E.2d 438, 443–44 (Ohio 1983) ("under R.C. 2305.11(A), a cause of action for medical malpractice accrues and the statute of limitations commences to run when the patient discovers, or in the exercise of reasonable care and diligence should have discovered, the resulting injury."); *Sheets v. Amcast Industrial, Inc.*, 2001 WL 508367, at *3 (Ohio App. 4 Dist. 2001) ("The Appellants are correct in their assertion that, when an injury does not manifest immediately, the cause of action for bodily injury does not accrue until the plaintiff discovers that he has been injured and that the injury was proximately caused by the conduct of the defendant. . . . However, the plaintiff bears the burden of alleging facts that invoke application of this discovery rule.").

Under the discovery rule, Reber's claim accrues, and the statute of limitations begins to run, "when the patient discovers or, in the exercise of reasonable diligence should have discovered, the resulting injury" by the conduct of the defendant. *Akers v. Alonso*, 65 Ohio St. 3d 422, 424-25 (Ohio 1992); *Flagstar*, 947 N.E.2d at 676. A "cognizable event," which is "some noteworthy event which does or should alert a reasonable person-patient that an improper medical . . . diagnosis has taken place," will trigger the statute of limitations. *Akers*, 65 Ohio St. 3d at 425 (emphasis omitted), citing *Allenius v. Thomas*, 42 Ohio St. 3d 131, 134 (Ohio 1989).

Defendants argue that Reber's cognizable event was when "Mrs. Reber was diagnosed with invasive cancer on December 12, 2012 . . . after having received a normal Pap result in April 2011." (Doc. 81 at 8.) At the latest, Defendants posit, the cognizable event was "when Mrs. Reber and her sister actively sought an attorney to review her case in July 2013." (Doc. 81 at 9.) Plaintiff, on the other hand, argues that there was no cognizable event until her expert witness reviewed the misread slide in October 2014. Because Plaintiff filed this lawsuit in December 2014, and because the Court determined that his claims are governed by the two-year statute of limitations for actions for bodily injury, Plaintiff's claim is only barred by the statute of limitations if the Court finds the cognizable event to be Mrs. Reber's diagnosis in December 2012.

The Court does not so find. That Mrs. Reber's diagnosis of invasive cancer in December 2012 should have immediately put her on notice to question her former doctors', and LabCorp employees', actions, when her April 2011 Pap test read "normal," is illogical. Mrs. Reber was not a doctor, and consequently would not be expected to know the rate at which cervical cancer develops. She is not similarly situated to the plaintiff in *Allenius v. Thomas*, 42 Ohio St. 3d 131 (Ohio 1989). Allenius was previously diagnosed with a milder form of cancer, for which her doctors treated her only with Pap smears. *Id.* at 134. The fact that she was later diagnosed with invasive cancer, the court held, "did or should have led [her] to believe that the follow-up treatment . . . of taking Pap smears, was negligently rendered." *Id.* The same is not true here. A reasonable patient, upon receiving a diagnosis of invasive cancer, does not necessarily have notice that she was mistreated by a normal Pap test 20 months prior. Allenius knew something was wrong at her first Pap test, but trusted her doctors to treat her properly. The same is true of the plaintiffs in *Waikem v. Cleveland Clinic Foundation*, No. 2011 CA 00234, 2012 WL

6014306, at *5 (Ohio Ct. App. 5th Dist. 2012), and *Kaplun v. Brenner*, No. 17791, 2000 WL 234707 (Ohio Ct. App. 2d Dist. Mar. 3, 2000). Waikem was rehospitalized for an infection two weeks after he underwent surgery. *Waikem*, 2012 WL 6014306, at *5. That infection and rehospitalization following surgery should have put him on notice of possible malpractice during the surgery. *Id.* at *6. Kaplun knew of a lump in her breast before her cancer diagnosis. *Kaplun*, 2000 WL 234707 at *5.

With no inkling of issues surrounding her 2011 Pap test, Reber did not know anything was wrong. Like the plaintiff in *Akers v. Alonso*, "there is nothing in the record herein that indicates that plaintiff[] knew or should have known [at the time of his cancer diagnosis] that the pathology slides had been erroneously diagnosed as being negative for cancer." 65 Ohio St. 3d 422, 425 (Ohio 1982). Therefore, her subsequent diagnosis of invasive cancer was not the "cognizable event."[6]

Because Mrs. Reber's 2012 diagnosis of invasive cancer is not the "cognizable event," and because the next possible event both parties point to is in October 2013, the Court finds that Reber's December 2014 lawsuit was timely filed within the two-year statute of limitations for causes of action for bodily injury. Defendants' Motion for Summary Judgment on the basis of the statute of limitations is **DENIED**.

### 4. Plaintiff Has Not Raised a Genuine Dispute of Material Fact to Support an Award of Punitive Damages

The Court may allow a punitive damages award only upon a finding that the defendant committed actual malice, fraud, or insult. *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987). Plaintiff's case for punitive damages is predicated on actual malice, which is:

---

[6] In *Flowers v. Walker*, 63 Ohio St. 3d 546 (Ohio 1992), the parties *agreed* that the discovery of her cancer gave Flowers "reason to believe that malpractice may have been committed[.]" *Id.* at 549. The Court decided, based on that agreement, that the diagnosis was the "cognizable event." Here, we have no such agreement.

> (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or
>
> (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Id.* Plaintiff does not contend that this case involves hatred, ill will, or a spirit of revenge; therefore, his case for punitive damages is based on a theory of conscious disregard. In a case of conscious disregard, Ohio courts require:

> before submitting the issue of punitive damages to the jury, a trial court [to] review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety.

*Id.* Conscious disregard requires a "positive element of conscious wrongdoing. . . . This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior." *Id.* The Court may not allow an award of punitive damages on a showing of "mere negligence." *Id.* Plaintiff must show actual malice "with clear and convincing evidence." *Kuebler v. Gemini Transp.*, No. 3:12–cv–114, 2013 WL 6410608, at *5 (S.D. Ohio Dec. 9, 2013) (internal citations omitted).

Moreover, the Supreme Court has held that "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422–23 (2003). More specifically, punitive damages may not be awarded against a defendant for an "injury that it inflicts upon those who are, essentially, strangers to the litigation." *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007).

In paragraphs 38-47 of his complaint, Plaintiff seeks punitive damages due to "LabCorp's systemic and intentional business practice that places LabCorp's interest before the welfare of the patients[.]" (Doc. 1 at ¶ 39.) This business practice includes, according to Plaintiff:

> requiring its cytotechnologists to screen large number[s] of slides per day despite the technologist's proficiency limitations, placing pressure on its cytotechnologists to screen Pap slides at a rate that sacrifices patient safety in favor of increased revenues, failing to adjust the number of slides the cytotechnologists screen, and failing to educate the cytotechnologists on diagnostic errors made. Due to these deficiencies, which LabCorp intentionally allows and knowingly authorizes, participates in, and ratifies, LabCorp has acted with 'willful misconduct and malice, which raises the presumption of conscious indifference to consequences' in causing Ms. Reber's cervical cancer and death.

(Doc. 70 at 12.)

LabCorp seeks summary judgment on Plaintiff's punitive damages claim because Plaintiff fails to show "how allegedly improper lab procedures led **Mrs. Reber's slide** to be misread" (Doc. 62-1 at 13 (emphasis in original)). For this reason and others, Defendants argue that Plaintiff cannot meet his burden to prove actual malice, especially given the Court's decision to exclude Dr. Rosenthal and Ms. Tan's Lab Deficiency Opinions. (*Id*. at 13, 15-18.)

According to Defendants, Plaintiff cannot link his hypothesis that LabCorp requires cytotechnologists to review too many slides per day to the alleged misread of Mrs. Reber's slide. Plaintiff's expert cytotechnologist, Ms. Tan, testified that a three-minute review of Mrs. Reber's slide would have alerted Ms. Queen to the need to perform a full manual review and pass the slide on to the pathologist. (Tan Dep., Doc. 61-9, at 381:2-11.) And LabCorp's records revealed that Ms. Queen reviewed the slide for four minutes and fifteen seconds. (McCrorey Aff't, Doc. 80-1, at 2.) In addition, Ms. Queen herself testified that she did not feel like she was reading too many slides. (Queen Dep. at 76:5-7, Doc. 62-2, Ex. H) ("I've never been at a point where I felt like I was reading too many [slides].") Therefore, Defendants argue, Ms. Queen's misread of Mrs. Reber's slide cannot be explained by inadequate time to read the slide.

Plaintiff does not address these causation arguments in his Opposition to Defendants' Motion for Summary Judgment. Instead, using estimations of time Ms. Queen would spend on breaks, at lunch, in the bathroom, etc., Plaintiff calculates an average slide time of just over two minutes for Ms. Queen for the day and month in question. (Doc. 70 at 13.) Plaintiff extrapolates from these estimates that Defendants, who keep time records, know that their cytotechnologists do not have enough time adequately to perform their work. And because the work—detecting cancer—is important, Defendants' knowledge of the time crunch shows its "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston*, 512 N.E.2d at 1176.

Plaintiff's estimated calculations that Ms. Queen had an average of just over two minutes of slide review time are not sufficient to overcome the fact that Ms. Queen reviewed Ms. Reber's slide for four minutes and fifteen seconds. According to Plaintiff's expert's testimony, a three-minute review should have been sufficient time to flag the slide for further review. Even if LabCorp's practices surrounding its cytotechnologists' work load are "unsavory" such that they harm people by short average slide review times, "[a] defendant should be punished for the conduct that harmed the plaintiff." *Campbell*, 538 U.S. at 422-23. Plaintiff has not raised an issue of material fact that these policies have harmed *Plaintiff*. *Id.* Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's punitive damages claim.

### 5. Mrs. Reber's Failure to Obtain a Recommended Pap Test in April 2012 Precludes Summary Judgment on Defendants' Contributory Negligence Affirmative Defense

Plaintiff seeks summary judgment on Defendants' contributory negligence affirmative defense,[7] arguing: (a) Mrs. Reber's failure to obtain Pap tests *before* Jessica Queen read her slide in 2011 is not "contemporaneous" with Ms. Queen's alleged negligence and therefore not

---

[7] Defendants withdrew their affirmative defense of third party liability. (Doc. 82 at 1.) Therefore, the Court need not address it.

competent evidence of contributory negligence (Doc. 86 at 2-5); (b) Defendants' evidence concerning Mrs. Reber's failure to obtain a recommended Pap test *in April 2012* lacks the element of causation (Doc. 86 at 6); and (c) Defendants have failed to offer any of its own expert testimony on either point (Doc. 73 at 7-9; Doc. 86 at 6-7.)   In opposition, Defendants point to Mrs. Reber's noncompliance with her gynecologists' orders to get Pap tests, both in the years leading up to 2011, and in April 2012.  (Doc. 82 at 2-7.)  Defendants also contend that *Plaintiff's* experts provide enough evidence for their contributory negligence claim.  (*Id.* at 8-9.)  The Court will address each argument in turn.

### a.  Mrs. Reber's Failure To Obtain Pap Tests Before 2011 Does Not Constitute Contributory Negligence

In Ohio, "[t]he contributory fault of the plaintiff may be asserted as an affirmative defense to a tort claim" of negligence.  *Striff v. Luke Md. Practitioners, Inc.*, 2010-Ohio-6261, ¶ 66 (Ohio Ct. App.3d Dist. 2010), citing Ohio Rev. Code § 2315.12; *Viox v. Weinberg*, 861 N.E.2d 909 (Ohio Ct. App. 1st Dist. 2006).  A patient may be negligent in "[d]isregarding a doctor's orders . . . , [b]ut there must be some evidence or proof of a causal connection between the alleged contributory patient negligence and the injury caused by the tortfeasor."  *Viox*, 861 N.E.2d at 914.   For the affirmative defense to apply, Plaintiff's negligence must be "contemporaneous with" and "an active and efficient contributing cause of the injury that is the basis of the patient's claim."  *Id.*

Plaintiff argues that, per *Lambert v. Shearer*, 616 N.E.2d 965 (Ohio Ct. App. 10th Dist. 1992) and *Reeves v. Healy*, 950 N.E.2d 605 (Ohio Ct. App. 10th Dist. 2011), evidence of Mrs. Reber's past failures to get Pap tests is not admissible as evidence of contributory negligence. Defendant disagrees, arguing that this case is more akin to *Striff v. Luke Med. Practitioners, Inc.*,

2010-Ohio-6261 (Ohio Ct. App. 3d Dist. 2010) and *Guiliani v. Shehata*, 19 N.E.3d 971, 972

(Ohio Ct. App. 1st Dist. 2014).

In *Lambert*, the plaintiff's husband died of advanced lung cancer. 616 N.E.2d 965, 969

(Ohio Ct. App. 10th Dist. 1992). The plaintiff sued his osteopath, who, for months critical to his

care, treated him with homeopathic therapies like:

> 'oxygen baths,' which entailed putting Lambert in a plastic bag full of oxygen on
> the belief that the oxygen would go through the skin by osmosis and clear the
> clogged-up lungs. Defendant also used Japanese Reiki massage, which was
> performed by a Japanese woman. He used Slippery Elm Tree Bark to stop the
> hacking cough. He said he treated plaintiff with manipulative treatments like
> 'foot reflexology,' 'diathermy,' acupuncture, and 'osteo-musculoskeletal'
> manipulation.

*Id.* at 968 n.2. According to the plaintiff's expert, Lambert had been in Stage I cancer when he

started seeing the osteopath. *Id.* at 975. By the time the decedent left the osteopath's care and

sought the advice of a medical doctor, he was terminally ill. *Id.* at 969. At trial, the court

directed a verdict for the plaintiff on the issue of contributory negligence. *Id.* at 976. The Tenth

District affirmed. *Id.* at 977. Even though the decedent "was a 'very difficult patient' who was

'running his own case,'" the court found that "defendant accepted Wayne Lambert for treatment

as he was and cannot point to anything Lambert did which could constitute contemporaneous

negligence." *Id.* at 976-77. Moreover, the court found it:

> improper to suggest, as defendant did at trial, that the negligent conduct of the
> patient prior to coming under the care of the defendant physician could serve to
> constitute negligence. Defendant cannot claim that Wayne Lambert caused or
> contributed to his own death by smoking for thirty years before seeing defendant.

*Id.* at 976.

In *Reeves*, the plaintiff suffered a stroke, which the defendant, an emergency-room

physician, misdiagnosed as pupil-sparing third-cranial-nerve palsy. 950 N.E.2d at 609. The

defendant had sought to admit evidence that the plaintiff was contributorily negligent for the her

stroke because, for the years leading up to it, she had failed consistently to take Coumadin, a blood thinner she was required to take for life following heart-valve replacement surgery many years earlier. *Id.* at 620. The trial court declined to allow this theory to proceed, and the court of appeals affirmed, because her alleged negligence:

> was not 'contemporaneous' with the alleged medical negligence of Dr. Healy. Plaintiff presented to Dr. Healy in the midst of a medical crisis, and Dr. Healy had the duty to provide reasonable medical care under those circumstances. Dr. Healy cannot avoid responsibility for any alleged failure to fulfill that duty by claiming that plaintiff's prior negligence caused or contributed to the condition requiring treatment of plaintiff. As a matter of law, any alleged negligence of plaintiff that may have contributed to her condition bringing her to Dr. Healy for treatment does not constitute a basis for a defense of contributory negligence.

*Id.* at 624. As a practical matter, the court held, Plaintiff's "failure . . . to follow the medical advice of other physicians could not have 'combined and concurred' with Dr. Healy's negligence to proximately cause plaintiff's injuries." *Id.*

In *Striff*, the plaintiff's husband died from a massive heart attack. *Striff*, 2010-Ohio-6261, ¶ 11. The plaintiff sued his doctors, who, in the years leading up to his death, repeatedly told him to complete blood work, see a cardiologist, and quit smoking. *Id.* ¶¶ 4-10. The decedent did not follow the doctors' instructions, and the jury found for the doctors, finding "the decedent to be 100% negligent." *Id.* ¶¶ 4-10, 14. The court of appeals affirmed on the issue of contributory negligence, pointing out that "[d]uring the trial, Appellees presented evidence demonstrating that Mr. Striff was non-compliant and repeatedly failed to follow medical advice." *Id.* ¶ 61. Mr. Striff's medical records:

> were peppered with missed appointments for follow-up care; with evidence of his continued failure to quit smoking; and with multiple failures to follow simple physician orders, such as seeing a cardiologist and obtaining a lipid profile to check his cholesterol. Even Appellant's expert, Dr. Payne, testified that the failure of Mr. Striff to have his cholesterol checked probably led to an increased risk for an adverse cardiac event.

*Id.* Importantly, the medical advice that the decedent failed to take was *the defendants'* medical advice. *See id.* Therefore, the court of appeals found sufficient evidence to present to the jury, and to uphold its verdict, that the decedent's negligence was "contemporaneous with" and "an active and contributing cause" of his injury. *Id.*

In *Guiliani v. Shehata*, the court considered the interaction between the comparative-negligence statute (Ohio Rev. Code § 2315.55) and the damages-cap statute (Ohio Rev. Foce § 2323.43) in the context of a failure-to-diagnose case. 19 N.E.3d 971, 972 (Ohio Ct. App. 1st Dist. 2014). There, Defendant Shehata, a radiation oncologist, was treating Guiliani for prostate cancer. *Id.* at 973. During the course of this treatment, Dr. Shehata reviewed a CT scan that showed a potential mass in Guiliani's colon but he did not bring the mass to Guiliani's attention. *Id.* Guiliani was diagnosed with colon cancer seven months later, and he sued Dr. Shehata for damages caused by the delayed diagnosis. *Id.* at 972-73. The jury returned a verdict for Guiliani, but also found that he was 30% negligent. *Id.* at 974-75. The appeal, as it related to contributory negligence, surrounded the mechanics of reducing the jury's verdict in light of the contributory negligence finding and the statutory damages cap. *Id.* It did not pertain to sufficiency of the contributory negligence finding, and the case does not disclose the basis for that finding. *Id.*[8]

After reviewing the above cases, as a matter of law, the Court finds that Plaintiff's *history* of failing to get Pap smears and follow-up treatment is not evidence of contributory negligence because it is not "contemporaneous with" Jessica Queen's misread of the slide from her 2011 Pap test.

---

[8] There was evidence submitted to the jury that Guiliani failed to get colonoscopies which, the evidence suggests, would likely have disclosed the colon cancer. *Id.* at 974-75. The evidence showed that he had been advised to get colonoscopies both before and after his first visit with Dr. Shehata. *Id.* The Court cannot discern, however, the basis for the jury's verdict of contributory negligence. *See id.*

b.  The Evidence Of Mrs. Reber's Failure To Follow Her Gynecologist's Advice To Get A Pap Test In April 2012 Is Sufficient To Withstand Summary Judgment

To show that Plaintiff committed contributory negligence, Defendants must "prove that the plaintiff breached a duty, proximately causing her own injury."  *Reeves*, 950 N.E.2d at 622. In other words, Plaintiff's "want of ordinary care . . . , which combined and concurred with the defendant's negligence and contributed to the injury as a proximate cause thereof, and as an element without which the injury would not have occurred." *Brinkmoeller v. Wilson*, 325 N.E.2d 233, 235 (Ohio 1975).  Unless Plaintiff's contributory negligence "is a direct and proximate cause of the injury received," it is "not a defense in an ordinary tort action." *Bahm v. Pittsburgh & L. E. R. Co.*, 217 N.E.2d 217, 220 (Ohio 1966).  The Ohio Jury Instructions define proximate cause to be "an act or failure to act that in the natural and continuous sequence directly produced the (injury) (death) (physical harm) and without which it would not have occurred."  Ohio Jury Instr. 405.01.

As evidence of contributory negligence for Plaintiff's having failed to get a Pap test in April 2012, Defendants point to the following:

(a) After the 2011 Pap test came back "negative," Dr. Thompson (Mrs. Reber's gynecologist) wanted Plaintiff to return for a yearly Pap test in April 2012 (Doc. 82 at 4; Thompson Dep., Doc. 82-2, at 103:2-19);

(b) Mrs. Thompson did not return to see Dr. Thompson for a yearly Pap test in April 2012 (*id.*)

(c) a Pap test in April 2012 would have shown either AIS or "early invasion from a pap smear standpoint" (Doc. 82 at 5, quoting Rosenthal Dep., Vol. 1, Ex. J to Dkt. 61-2, at 244:3-10);

(d) "a properly performed and processed pap test from April 2012 would have shown cervical abnormalities" (*id.* at 6, citing Irvin Dep., Ex. K to Dkt. 61-2, at 116:16-117:16);

(e) Mrs. Reber "more likely than not . . . did not have an invasive tumor in April of 2011" and instead had "adenocarcinoma in situ" (*id.*, quoting Irvin Dep., at 114:9-16, 116:3-6);

(f) It is more likely than not that Mrs. Reber developed invasive cancer soon after April 2011 (*id.*, quoting Irvin Dep., at 116:6-7);

(g) "the universal reality is that the earlier you're diagnosed with your cancer, the better your prognosis" (*id.*, quoting Irvin Dep., at 162:10-12);

(h) "you wouldn't need to apply either radiation therapy or chemotherapy to her cervical tumor that's not already advanced stage. I mean, that's stage 2, stage 3, stage 4 disease. So if you can treat this before it reaches those stages, then you don't need to apply modalities that would probably not respond given the nature of that tumor. I mean, you can have a – you can have a very aggressive tumor, but if you catch it very early before it has a chance to spread, you cure that tumor" (*id.*, quoting Irvin Dep., at 155:17-23. *See also* Irvin Dep., at 155:12-17);

(i) if Mrs. Reber's tumor were confined to the cervix, doctors would have recommended taking the cervix and uterus out (*id.*, quoting Irvin Dep., at 155:25-156:14);

(j) the overall survival rate for women diagnosed with AIS, as opposed to invasive cancer, is in the 95-98% range overall (*id.*, quoting Irvin Dep., at 162:13-15);

(k) the survival rate for microinvasive, stage IA1 cancer is 95%. (*id.*, quoting Irvin Dep., at 162:15-17.)

Plaintiff responds rather summarily to this evidence, stating:

[f]or the April 2012 missed Pap test, Defendants provide testimony from Plaintiff's experts' depositions in an attempt to show contributory negligence, but fail in this effort. The attempt to portray the experts' discussion as evidence of comparative fault seems somewhat desperate. Nothing in the depositions of any of Plaintiff's experts provides any evidence of contributory negligence. The cited testimony is devoid of any evidence of causation. Moreover, these empty claims provide no evidence that an April 2012 Pap test would have prevented Mrs. Reber's death or made any difference in the prognosis.

(Doc. 86 at 6.) In short, Plaintiff argues that the cited evidence fails to demonstrate causation. This evidence, however, is sufficient to raise a material fact regarding the issue of causation, and, consequently, contributory negligence.

### c. While Defendants Must Have Expert Testimony To Prove Causation, The Parties Have Pointed To Nothing Requiring Defendants To Have *Their Own* Expert Testimony

Plaintiff also argues that Defendants must use expert testimony to show causation and contributory negligence—indeed, Plaintiff argues that Defendants must obtain this evidence from Defendants' *own* experts, which they failed to designate. (Doc. 86 at 6-7.) Defendants disagree, contending that they may meet their burden of proof "through evidence adduced by Plaintiff, including admissions from his own expert witnesses." (Doc. 82 at 8.)

It is true, in the first instance, that this is not a case in which contributory negligence may be proven without expert testimony. Indeed:

> when contributory patient negligence becomes an issue in a medical-malpractice case, there is often a need for the defendant physician to offer expert testimony on the issue. Usually, expert medical testimony is required to identify the proximate effect that a patient's negligence may have had on her medical condition.

*Viox*, 861 N.E.2d at 914 (internal citations omitted). *See also Lambert*, 616 N.E.2d at 977 ("Medical experts must testify that the proximate effect of plaintiff's negligence aggravated the relevant medical condition."). Such expert testimony would not be required only in "those very rare instances when it would be obvious to any layman." *Lambert*, 616 N.E.2d at 977. Here, the determination that Mrs. Reber failed to exercise reasonable care for her own safety by failing to get a pap test in April 2012, and that this failure was the proximate cause of her death, "was not one of 'those very rare instances' when causation 'would [have] be[en] obvious to any layman.'" *Viox*, 861 N.E.2d at 914 (internal citations omitted).

On the other hand, Plaintiff has put forth no authority, and the Court has not found any, that would preclude Defendants from making their case of contributory negligence through

Plaintiff's own experts. While this case is unusual in that Defendants do not intend to put on *any* of their own evidence, Courts in Ohio have found the evidence of plaintiffs, including plaintiffs' experts, to support defendants' claims of contributory negligence. *Robison & Weaver v. Gary*, 28 Ohio St. 241, 248 (1876); *Striff*, 2010-Ohio-6261, ¶ 61.

Therefore, at this juncture, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment because there is a genuine dispute of material fact about Plaintiff's failure to obtain a Pap test in April 2012.

### III.     CONCLUSION

For the above reasons, the Court: (1) **GRANTS** Defendants' Motion to Exclude Plaintiff's Experts' Lab Deficiency Opinions, but **DENIES** the Motion to Exclude their Standard of Care Opinions (Doc. 61); (2) **GRANTS** Defendants' Motion for Summary Judgment on punitive damages, but **DENIES** the motion as to Plaintiff's underlying claims (Doc. 62); (3) **DENIES** Plaintiff's Motion for Partial Summary Judgment as to Defendants' Comparative Fault/Third Party Liability Affirmative Defenses, but only to the extent Mrs. Reber failed to obtain a Pap test in April 2012 (Doc. 73); (4) **GRANTS in part** and **DENIES in part** Defendants' Motion to Strike (Doc. 78); and (5) **GRANTS** Plaintiff's Motion for Surreply (Doc. 89).


**IT IS SO ORDERED.**

                         **__s/ Algenon L. Marbley_____**
                         **ALGENON L. MARBLEY**
                         **UNITED STATES DISTRICT JUDGE**


**DATED:  September 6, 2017**